UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMOND SHAWN ARMSTRONG,

               Petitioner,

                                       CASE NO. 13-12886
v.                                   HONORABLE NANCY G. EDMUNDS

LLOYD RAPELJE,

               Respondent.
_____/

**OPINION AND ORDER
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED _IN FORMA PAUPERIS_ ON APPEAL**

State prisoner Damond Shawn Armstrong ("Petitioner") has filed a *pro se* habeas corpus petition challenging his Wayne County, Michigan convictions for second-degree murder, assault with intent to commit murder, and possession of a firearm during the commission of a felony (felony firearm).  Petitioner raises several claims regarding his trial attorney, his right to a speedy trial, the identification testimony, the prosecutor's conduct, "bad acts" evidence, the jury instructions, and the sentencing guidelines.  Respondent Lloyd Rapelje urges the Court to deny the habeas petition.  Having reviewed the pleadings and state-court record, the Court agrees that Petitioner's claims do not warrant habeas relief.  Accordingly, the petition will be denied.

### I.  Background

The Wayne County prosecutor charged Petitioner with first-degree murder, assault with intent to commit murder, and felony firearm.  The charges arose from a

shooting at an after-hours club on Cecil Street in Detroit, Michigan. Mark Williams was shot and killed during the incident. Travon Williams, who was not related to Mark Williams, was shot ten times during the incident, but survived and testified at trial. The key witnesses at trial were Adolfa Ramos Plascencia and Gina Durbin, who identified Petitioner in a photo array eight days after the shooting and again at trial.

Travon Williams testified that the shooter appeared to be having a little argument with his cousin Gina at the after-hours club on March 30, 2008. The shooter subsequently got up, went to the back of the house, returned, and fired a gun through his jacket. The bullet hit Travon's arm. He stood up and started running to the door, but the shooter shot him twice in the back. He fell to the ground, rolled over, and said to the shooter, "You're not shooting me in my face." He grabbed the gun and wrestled with the shooter, but the shooter managed to shoot him twice in the stomach, once more in the arm, and four times in the leg for a total of ten times. Travon stated at trial that he could not identify the shooter and that he did not see the shooter in the courtroom.

Adolfa Ramos Plascencia ("Ms. Ramos") testified that she was at the after-hours club with Travon, her friend Gina, and another friend on March 30, 2008. According to Ms. Ramos, Petitioner approached Gina and asked whether Gina had a problem with him. Ms. Ramos reassured Petitioner that they were just talking and did not want any problems. Petitioner then sat on a sofa, but continued to stare at Ms. Ramos and her friends as he rocked back and forth with an odd look in his eyes. Ms. Ramos got up to leave because she had a bad feeling about the situation. She subsequently saw Petitioner walk toward Travon and Mark, pull out a gun, and start shooting. Petitioner

2

subsequently walked past her, looked in the kitchen, and walked out of the house. Petitioner tried to get back in the house, but she and Gina managed to lock the door and keep him out of the house.  She subsequently identified Petitioner at a photo line-up on April 7, 2008.

Gina Durban testified that she and her friends were talking in the after-hours club when Petitioner approached her and asked her for a light.  She got a lighter out of her purse, but it burned her, and they laughed about it.  At the time, Mark Williams, her cousin Travon Williams, and Adolfa Ramos were nearby.  She (Ms. Durbin) pulled out her phone to display a picture, because Petitioner knew her children's father.  As she sat back down, Petitioner started shooting at Travon.  Petitioner fired a lot of shots.  She identified Petitioner in a photo line-up eight days after the shooting.

Dr. Francisco Diaz performed the autopsy on Mark Williams.  He testified that Mark Williams had four gunshot wounds and that the cause of death was multiple gunshot wounds.

Evidence technician William Niarhos testified that he found four spent bullets and nine .40 caliber casings at the crime scene.  Police officer Moises Jimenez testified for the prosecution that Petitioner had two .40 caliber firearms registered to him.

Petitioner did not testify, and he called Officer Jimenez as his only defense witness.  Officer Jimenez testified on direct examination by defense counsel that he showed a single photograph of Petitioner to either Ms. Ramos or Ms. Durbin.  Petitioner was smiling in the photograph, and his gold or silver dental work was visible in the photograph.  On cross-examination and recross-examination, Officer Jimenez explained

that he showed the single photograph to Ms. Ramos and Ms. Durbin after they both identified Petitioner in a photo array consisting of six photographs.

The defense theory was that Travon Williams exonerated Petitioner when he testified that he was unable to identify the shooter in court. Defense counsel argued to the jury that Ms. Ramos and Ms. Durbin were not credible witnesses, that there was no corroborating evidence, and that there was no evidence of premeditation.

On October 21, 2009, the jury found Petitioner guilty of second-degree murder, Mich. Comp. Laws § 750.317, as a lesser offense of first-degree murder, for the fatal shooting of Mark Williams. The jury also found Petitioner guilty of assault with intent to commit murder, Mich. Comp. Laws § 750.83, for the shooting of Travon Williams, and felony firearm, Mich. Comp. Laws § 750.227b, in connection with either the assault or the murder. On November 5, 2009, the trial court sentenced Petitioner to a term of twenty-five to forty-five years in prison for the murder conviction, a concurrent term of seventeen and a half to thirty years in prison for the assault, and a consecutive term of two years in prison for the felony firearm conviction.

Petitioner raised his habeas claims in an appeal as of right. The Michigan Court of Appeals affirmed Petitioner's convictions and sentence in an unpublished, *per curiam* opinion. *See People v. Armstrong*, No. 295293 (Mich. Ct. App. Feb. 24, 2011). On July 25, 2011, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Armstrong*, 489 Mich. 992; 800 N.W.2d 594 (2011).

4

In 2012, Petitioner filed a motion for an evidentiary hearing on the basis of newly discovered exculpatory evidence.  The trial court construed the motion as a motion for relief from judgment and denied it after concluding that Petitioner had previously raised his claims on direct appeal and that his motion was not predicated on newly discovered evidence.  The Michigan Court of Appeals denied Petitioner's application for leave to appeal the trial court's decision, *see People v. Armstrong*, No. 308991 (Mich. Ct. App. Aug. 24, 2012), and on January 11, 2013, the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Armstrong*, 493 Mich. 923; 824 N.W.2d 168 (2013).

While Petitioner's second application for leave to appeal in the Michigan Supreme Court was pending, he filed a *pro se* habeas corpus petition in this District. United States District Judge Patrick J. Duggan dismissed the petition without prejudice because Petitioner was awaiting a decision from the Michigan Supreme Court with respect to the trial court's denial of his post-conviction motion.  *See Armstrong v. Rapelje*, No. 12-cv-14619 (E.D. Mich. Nov. 27, 2012).

On July 2, 2013, Petitioner returned to this Court and filed the pending habeas corpus petition under 28 U.S.C. § 2254.  He argues that:  (1) he was denied effective assistance of counsel because trial counsel abandoned his alibi defense and failed to call witnesses; (2) he was denied his right to a speedy trial; (3) the trial court deprived him of due process by refusing to suppress the prosecution witnesses' identification testimony; (4) the prosecutor deprived him of due process by arguing that Petitioner exited the after-hours establishment to retrieve a second weapon; (5) the prosecutor

5

deprived him of due process by eliciting prior "bad acts" evidence; (6) the trial court erred by reading a jury instruction on flight; (7) trial counsel deprived him of effective assistance by failing to object to the prosecutor's closing argument and the admission of improper evidence; and (8) the trial court incorrectly scored offense variables five and seven of the Michigan sentencing guidelines.  Petitioner also appears to raise a claim about the state trial court's denial of his post-conviction motion concerning newly discovered evidence.

Respondent argues in his answer to the petition that Petitioner procedurally defaulted some of his claims in state court.  The Court declines to analyze whether any of Petitioner's claims are procedurally defaulted, because (1) the claims lack substantive merit, (2) "a procedural default . . . is not a jurisdictional matter," *Trest v. Cain*, 522 U.S. 87, 89 (1997), and (3) a procedural-default analysis "adds nothing but complexity to the case," *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010).  The Court therefore excuses any procedural defaults and proceeds directly to the substance of Petitioner's claims, using the following standard of review.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

6

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## III.  Analysis

### A.  Trial Counsel (claim one)

Petitioner claims that his trial attorney deprived him of effective assistance by abandoning his alibi defense and by failing to call alibi witnesses Angela Ratliff and Timothy Blair.  The Michigan Court of Appeals adjudicated this claim on direct appeal and rejected it because Petitioner failed to show that trial counsel's strategic decisions deprived him of a substantial defense.

#### 1.  Clearly Established Federal Law

An attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

8

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

### 2. Application

The record indicates that Petitioner referred his trial attorney to Ms. Ratliff, who was certain that Petitioner was present with her in Ohio when the shootings at the after-hours club in Detroit occurred. On September 11, 2009, defense counsel interviewed Angela Ratliff in his office. She subsequently visited Petitioner and talked to him, and before she left town, she knew where the courthouse was. (Trial Tr. Vol. III, 7-8, Oct. 15, 2009.) On September 16, 2009, defense counsel filed a notice of intent to call Angela Ratliff and Timothy Blair as alibi witnesses. About ten days before trial, however, Ms. Ratliff expressed concern about homicide detectives coming to her house in Ohio. Although defense counsel tried to reassure her, she informed defense counsel after Petitioner's trial commenced that neither she, nor  Mr. Blair, would be coming to Detroit for the trial.

On the third day of trial (Thursday, October 15, 2009), defense counsel requested an adjournment of the trial to consult with Petitioner. He stated that Ms. Ratliff was not returning his phone calls and that he feared she had been threatened or

9

intimidated.  (*Id.* at 7-10.)  The trial court allowed the trial to continue for the day, but then adjourned the trial until the following Tuesday, October 20, 2009.  (*Id.* at 10-15.)

When the trial resumed on October 20, 2009, defense counsel informed the trial court that he had formally withdrawn his alibi defense.  (Trial Tr. Vol. IV, 3, Oct. 20, 2009.)  Defense counsel did not provide an explanation for his decision to withdraw the alibi defense, but he maintained at Petitioner's sentencing that the alibi witness was frightened into not cooperating with the defense.  (Sentencing Tr., 22,  Nov. 5, 2009.)

"[T]he failure to call a known alibi witness generally would constitute ineffective assistance of counsel."  *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).  In this case, however, it appears from defense counsel's comments at trial and at sentencing that Ms. Ratliff and Mr. Blair were unwilling or unavailable to testify in Petitioner's behalf. Under the circumstances, defense counsel's abandonment of the alibi defense did not amount to deficient performance.

Petitioner contends that his attorney should have obtained subpoenas to compel the alibi witnesses' appearance at trial.  The Michigan Court of Appeals, however, pointed out that, even if subpoenas were issued and Ratliff and Blair were forced to testify, they did not sign an affidavit confirming what they would have said if they did testify in Petitioner's defense.

Petitioner has failed to establish that Ratliff and Blair would have provided helpful testimony for the defense if they were subpoenaed to testify at trial.  It follows that defense counsel's allegedly deficient performance did not prejudice Petitioner.  An attorney is not ineffective for failing to call an alleged alibi witness where there is no

10

affidavit from the witness or other evidence establishing that the witness would have provided helpful testimony for the defense. *Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000). Habeas relief therefore is not warranted on Petitioner's first claim.

## B. Speedy Trial (claim two)

Petitioner alleges that he was denied his right to a speedy trial under state and federal law. He claims that he was not responsible for the delay in bringing him to trial and that the delay affected his ability to pursue an alibi defense. The Michigan Court of Appeals disagreed with Petitioner and concluded that he had failed to establish how the delay prejudiced his opportunity for a fair trial.

### 1. Clearly Established Federal Law

The Constitution guarantees a criminal defendant the right to a speedy trial. U.S. CONST. amend. VI. When determining whether a petitioner's right to a speedy trial was violated, courts must consider and balance the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) any prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

"The length of the delay is measured from the date of the indictment or the date of the arrest, whichever is earlier." *Maples v. Stegall*, 427 F.3d 1020, 1026 (6th Cir. 2005) (citing *United States v. Marion*, 404 U.S. 307, 320 (1971), and *Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir. 1987)). "If the length of the delay is not 'uncommonly long', then judicial examination ends." *Id.* at 1025 (citing *Doggett v. United States*, 505 U.S. 647, 652 (1992)). In other words, "[t]he length of the delay is to some extent a

triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530.

### 2. Application

#### a. Length of the Delay

Petitioner was arrested in Ohio on February 7, 2009, and detained until his trial commenced on October 13, 2009.  *See Armstrong*, No. 295293, 2011 WL 683108, at *1.  The delay from arrest to trial was slightly more than eight months.  Although "there is authority for the proposition that a delay of as little as eight months may be considered 'presumptively prejudicial,' triggering consideration of the other *Barker* factors," *United States v. Chew*, 497 F. App'x 555, 558 (6th Cir. 2012), the Sixth Circuit has stated elsewhere that "[a] delay approaching one year is presumptively prejudicial and triggers application of the remaining three factors." *Maples*, 427 F.3d 1026 (citing *Doggett*, 505 U.S. at 652 n. 1); *see also United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011) ("This court has held that a delay of more than one year is presumptively prejudicial and triggers application of the remaining three factors.").  Thus, the delay in this case arguably was not presumptively prejudicial and does not require application of the remaining *Barker* factors.

#### b. Reason for the Delay

Even assuming that the eight-month delay in this case was "uncommonly long," part of the reason for the delay was because law enforcement officials could not find Petitioner after he was identified as a suspect.  Once he was found, the extradition

proceedings took about three months, and the trial court determined that the prosecution did not delay in their efforts to extradite Petitioner. (Mot. Hr'g, 11, Sept. 25, 2009.) Other reasons for the delay are not apparent from the record. So, the reason for the delay is neutral.

### c. Timeliness of the Demand for a Speedy Trial

On August 7, 2009, Petitioner made a timely motion to dismiss the charges on the basis that his right to a speedy trial was violated. This factor weighs in his favor.

### d. Prejudice

Regarding the fourth and final factor, Petitioner has not shown any prejudice as a result of the delay. He was given sentencing credit for the time that he spent in jail before trial. Although he claims that the delay affected his ability to pursue an alibi defense, the main alibi witness was prepared to testify in Petitioner's defense until about ten days before trial when she expressed concern about being interviewed by homicide detectives. It was not until after the trial commenced that the alibi witnesses decided not to testify in Petitioner's defense. Defense counsel thought that the reason the witnesses decided not to testify for Petitioner was that they had been threatened or intimidated. (Trial Tr. Vol. III, 7-10, Oct. 15, 2009.) Petitioner has not shown that the delay in trying him caused the witnesses to be threatened or intimidated.

### e. Summary

To summarize, the delay was not uncommonly long, and the reason for the delay is neutral. Although Petitioner made a timely demand for a speedy trial on August 7, 2009, (Mot. Hr'g, 4, Sept. 25, 2009), he has not shown prejudice. One factor weighs in

his favor, one factor is neutral, and two factors weigh in the State's favor. On balance, the *Barker* factors weigh in favor of finding that Petitioner's Sixth Amendment right to a speedy trial was not violated. Even if the Court had concluded otherwise, the state court reasonably concluded that Petitioner's claim failed because he failed to establish how the delay prejudiced his opportunity for a fair trial.

Petitioner's claim that his right to a speedy trial under state law was violated fails because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The Court therefore declines to grant relief on Petitioner's speedy trial claim.

**C. The Identification Testimony** (claim three)

Petitioner asserts that the trial court deprived him of due process by refusing to suppress the eyewitnesses' identification testimony. Petitioner argues that the testimony was based on a suggestive photo array in which he was one of only two bald-headed men. Petitioner also claims that at least one eyewitness (Ms. Durbin) was shown an unduly suggestive photograph of him in which he was smiling and his silver dental work was prominently displayed.

The Michigan Court of Appeals opined that the photo array was not impermissibly suggestive and that Petitioner's arguments about the single photograph failed because Ms. Ramos did not see the single photograph until defense counsel introduced it at the preliminary examination. As for Ms. Durbin, the Court of Appeals opined that the single photograph was not suggestive because she knew Petitioner before the shooting, and she viewed the single photograph of Petitioner after she

14

identified Petitioner in the photo array, which did not contain the contested photo with the dental work prominently displayed.

### 1. Clearly Established Federal Law

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability . . . ." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012). An identification procedure violates due process of law if the confrontation was "'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Neil v. Biggers,* 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.* at 198.

### 2. The Single Photograph

Petitioner contends that at least one eyewitness (Ms. Durbin) was shown a single photograph of him in which his distinctive silver dental work was prominently displayed. He contends that this procedure was unduly suggestive.

The improper employment of photographs by police can "cause witnesses to err in identifying criminals" and "[t]his danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw." *Simmons v. United States*, 390 U.S. 377, 383 (1968). In this case, Ms. Durbin apparently informed the police after the shooting that the shooter had a gold tooth. (Trial Tr. Vol. II, 126-27, Oct. 14, 2009.) Under the circumstances, showing her a

15

single photograph of Petitioner with his gold tooth visible probably was suggestive.  The Supreme Court, however, has not prohibited the use of single photographs, and it held in *Simmons* that "each case must be considered on its own facts."  *Simmons*, 390 U.S. at 384; *see also Manson v. Brathwaite,* 432 U.S. 98, 109-14 (1977) (refusing to adopt a *per se* rule of exclusion where only one photograph was shown to a witness); *Snyder v. United States*, 590 F. App'x 505, 512 (6th Cir. 2014) (stating that, "[w]hile it is true that use of a single photograph for a witness identification may be unduly suggestive, such a procedure is not inherently or presumptively unconstitutional").

The record here indicates that Officer Jimenez showed a single photograph of Petitioner with a gold tooth to Ms. Ramos and Ms. Durbin *after* they identified Petitioner in a photo array consisting of six photographs.  (Trial Tr. Vol. III, 30, 33, 36-37, Oct. 15, 2009; Trial Tr. Vol. IV,  13-16, Oct. 20, 2009.)  Thus, the single photograph of Petitioner depicting his distinctive dental work could not have led to irreparable mistaken identification.

### 3.  The Photo Array Consisting of Six Photographs

Petitioner alleges that the photo array shown to Ms. Ramos and Ms. Durbin was suggestive because he was one of only two bald-headed men in the photo array.

"Most eyewitness identifications involve some element of suggestion," *Perry*, 132 S. Ct. at 727, but "[a]n identification infected by improper police influence . . . is not automatically excluded.  Instead, the trial judge must screen the evidence for reliability pretrial."  *Id.* at 720.  "[I]f the indicia of reliability are strong enough to outweigh the

corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.*

Here, there was one other bald-headed man besides Petitioner in the photo array, and two or three of the other men had short hair. *See* Pet. for Writ of Habeas Corpus, Ex. Q. A lineup can taint an identification where a witness emphasized a particular characteristic of the suspect in her description to the police and the defendant is the only person in the lineup with that characteristic. *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001). But the Court has found no indication in the record that Ms. Ramos or Ms. Durbin emphasized Petitioner's baldness in their statements to the police. Nor is it clear that they selected Petitioner's photograph in the array because he was bald. Ms. Durbin, in fact, had seen Petitioner previously in the neighborhood (Mot. Hr'g, 53-54, Aug. 28, 2009) and at a bar before the day of the shooting (Trial Tr. Vol. II, 80-81, Oct. 14, 2009). She claimed that it was easy to pick him out of the array because she knew who he was. (Trial Tr. Vol. II, 118, Oct. 14, 2009.) The record therefore does not support the suggestion that the lack of more bald-headed men in the photo array "steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009) (citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001 )).

Even if the Court were to assume that the photo array was suggestive, the question then is whether, under the totality of the circumstances, the identification was reliable despite a suggestive confrontation procedure. *Biggers*, 409 U.S. at 199.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of

17

the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200.

### a. Ms. Ramos

Ms. Ramos testified that she was approximately two arms-lengths away from Petitioner before the shooting, that nothing was blocking her vision, that the lights were on, and that she could see clearly. (Trial Tr. Vol. II, 47, Oct. 14, 2009). Thus, she had a good opportunity to view the shooter.

Her degree of attention apparently was good because she heard Travon Williams say to the shooter, "Don't shoot me in my face, man." (*Id.* at 45, 48.) She also stated that she was watching Petitioner during the entire shooting incident. (*Id.* at 43.) She had reason to pay attention to the shooter because she was not a disinterested bystander. *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005). The shooter fired at one of her companions, and she was nearby when the shooting occurred. Although Ms. Ramos estimated that she drank five or six beers over a period of seven hours, she claimed that she was not intoxicated at the time of the shooting. (Trial Tr. Vol. II, 40, Oct. 14, 2009.)

Petitioner has not alleged that Ms. Ramos' description of the shooter was inaccurate, and, at trial she stated that she had no doubt Petitioner was the shooter. In fact, she stated that she would never forget him. (*Id.* at 49.) She subsequently stated that she was 101 percent sure of her identification, that there was no question in her mind about it, and that she would never forget Petitioner's face. (*Id.* at 53.) Finally, the

18

length of time between the crime and her identification of Petitioner in a photo array was a mere eight days.  (*Id.* at 49-51.)

### b.  Ms. Durbin

Ms. Durbin also had a good opportunity to view Petitioner.  She had a conversation with Petitioner shortly before the shooting when he kneeled down in front of her and asked her for a light.  (*Id.* at 75, 102.)  He was about a foot away from her at the time.  (*Id.* at 103.)  Her degree of attention apparently was good because she was able to recall at trial what she said to Petitioner, who was present during their conversation, and what was said during Petitioner's conversation with Travon.  (*Id.* at 75-77, 79, 81-85.)  Petitioner has not alleged that Ms. Durbin's prior description of him was inaccurate, and  she claimed at trial that she had "no doubt at all" that Petitioner was the shooter.  (*Id.* at 89, 92.)  The length of time between the crime and her viewing of the photo array was eight days.  (*Id.* at 91.)

### c.  Summary

To summarize, both Ms. Ramos and Ms. Durbin had a good opportunity to view the suspect at the time of the crime, their degree of attention was good, their description of the suspect apparently was accurate, they were very sure of their identification of Petitioner, and the length of time between the crime and the identification was short. Thus, even if the photo array was suggestive, there was an independent basis for the eyewitnesses' identification of Petitioner.

19

The state court's adjudication of Petitioner's claim was objectively reasonable. Therefore, Petitioner is not entitled to relief on the basis of his challenge to the identification testimony.

**D.  The Prosecutor** (claim four)

Petitioner contends that the prosecutor deprived him of due process by stating in his closing argument that Petitioner exited the after-hours establishment so that he could retrieve a second weapon from his car, return to the establishment, and resume shooting the victims.  The actual comments were:

> [B]oth women said that Mr. Armstrong left and tried to come back, but they had locked the door in some kind of way.

> . . . .  [W]hy did he try to get back in?  It's the People's best guess that he had exhausted the weaponry that he had with the 14 shots and he went out to get the second gun in the car and to come back.  That's when he was coming back in.

(Trial Tr. Vol. IV, 26-27, Oct. 20, 2009.)  Petitioner claims that there was no evidence to support this argument, as no witness testified that he had a second weapon or went to his car to retrieve one.

The Michigan Court of Appeals reviewed Petitioner's claim for "plain error" because Petitioner did not object to the prosecutor's comment at trial, nor request a curative instruction.   The Court of Appeals then stated that Petitioner had not established plain error because the prosecutor made a reasonable inference, which was supported by evidence of Petitioner's ownership of two guns, that Petitioner returned to the house with a second gun.

### 1.  Clearly Established Federal Law

Prosecutors may not misrepresent the facts or assert facts that were never admitted in evidence, "because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.' "  *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir.  2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). But "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

> [I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031, 1036 (11th Cir. 1983)].   The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).   Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642, 94 S.Ct., at 1871.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).   "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' "  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

### 2.  Application

Petitioner is correct that there was no evidence he possessed more than one gun during the crime or that he exited the after-hours club so that he could retrieve a second weapon from his car,   return to the club, and resume shooting the victims. Nevertheless, there was substantial evidence that he shot the victims, and the prosecutor noted at the beginning of his remarks that his and defense counsel's

21

remarks were not evidence.  (Trial Tr. Vol. IV, 20, Oct. 20, 2009.)[1]  The trial court subsequently instructed the jurors that the lawyers' statements and argument were not evidence, but only meant to help the jurors understand the evidence and each party's legal theories.[2]  The court also said that the jurors should accept what the lawyers said only if the attorneys' remarks were supported by the evidence or by their own common sense and general knowledge.  (*Id.* at 47-48.)

Given the trial court's jury instruction and the strength of the evidence against Petitioner, the prosecutor's remarks could not have infected the trial with such unfairness as to deprive Petitioner of a fair trial.  Therefore, the state court's rejection of Petitioner's claim was objectively reasonable, and Petitioner is not entitled to relief on the basis of his challenge to the prosecutor's remarks.

**E.  "Bad Acts" Evidence** (claim five)

Petitioner alleges next that the prosecutor deprived him of due process by eliciting testimony, and emphasizing during closing arguments, that Petitioner had two .40 caliber handguns registered in his name.  Petitioner contends that the evidence was not admissible under the Michigan Rules of Evidence because it was improper character evidence and irrelevant.  He further alleges that a cautionary jury instruction would not have cured the prejudice.

The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner did not object to evidence that he had two handguns registered in his name.

---

[1]  The prosecutor also stated at the beginning of trial that the attorneys' comments were not evidence.  (Trial Tr. Vol. II, 25, Oct. 14, 2009.)

[2]  The court gave a similar instruction at the beginning of the trial, before any testimony was taken in the case.  (Trial Tr. Vol. II, 17, Oct. 14, 2009.)

The Court of Appeals concluded from its review for plain error that Petitioner's claim failed because evidence of his gun ownership was not admitted to show a propensity to commit the crimes, but to show that Petitioner had the means to commit the crimes. The Court of Appeals also said that the evidence was relevant and that Petitioner had failed to show the evidence was unfairly prejudicial.

This Court finds no merit in Petitioner's claim because the alleged violation of the Michigan Rules of Evidence is not a cognizable claim on habeas corpus review. *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009). Moreover, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to' under AEDPA." *Id.* at 513. Habeas review, therefore, is not warranted on Petitioner's claim regarding evidence of his gun ownership.

**F.  The Jury Instruction on Flight** (claim six)

Petitioner asserts that the trial court erred by giving a jury instruction on flight where there was no evidence to support the instruction. The Michigan Court of Appeals disagreed with Petitioner and concluded that giving the jury instruction on flight was within the range of principled outcomes. In reaching this conclusion, the Court of Appeals stated that the evidence was sufficient to support an inference that Petitioner fled the jurisdiction after the crimes were committed. The Court of Appeals also noted that the jury instruction left the determination of whether Petitioner "fled" to the jury.

23

### 1. Clearly Established Federal Law

"[N]ot every . . . deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). The only question on habeas review of a jury instruction is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). To obtain habeas relief, the instruction must have infused the trial with such unfairness as to deprive the petitioner of due process of law. *Id.* at 75 (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)); *see also Wheeler v.* Simpson, 779 F.3d 366, 395 (6th Cir. 2015) (stating that, "[t]o warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair.' ") (quoting *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)), *petition for cert. filed*, June 23, 2015).

The Supreme Court "has consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." *Wong Sun v. United States*, 371 U.S. 471, 483 n.10 (1963). "Where evidence of flight has genuine probative value, however, it is generally admissible as evidence of guilt, and . . . juries are given the power to determine how much weight should be given to such evidence." *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989) (quotation marks omitted).

**2. Application**

The trial court initially stated that there was no evidence Petitioner had tried to run away or hide after the crime.  (Trial Tr. Vol. IV, 4-6, Oct. 20, 2009.)  Officer Jimenez subsequently testified that he obtained a warrant for Petitioner's arrest and handed it to a specialized law enforcement unit, which tracks down people for whom the police department has warrants.   According to Jimenez, the law enforcement unit found Petitioner in Wooster, Ohio, and he was extradited from Ohio to Michigan in May of 2009, about fourteen months after the shooting.  (*Id.* at 17-18.)

The trial court later read the following instruction to the jury:

> Now the Prosecutor has suggested that there was flight at the time –
> immediately after the time of the crime and by the move to Wooster, Ohio.
> This evidence does not prove guilt.  A person may run or hide for innocent
> reasons; panic, mistake or fear.  He may move for totally innocent reasons
> as well.  A person may also run or hide because of a consciousness of
> guilt.  You must decide whether or not there is evidence of guilt – of flight
> and – if true, whether it shows the Defendant had a guilty state of mind.

(*Id.* at 58.)

Petitioner correctly points out that there was no evidence as to when he went to Ohio, how long he was there, or whether his presence in Ohio was related to the charged crimes.  The contested jury instruction, however, gave the jury the option of deciding whether Petitioner left the state for innocent reasons or fled, and, if he fled, whether he did so due to a guilty conscience.  "Because the jury instruction directed [the] jurors to make their own determinations as to whether [Petitioner] did in fact flee and if so, what state of mind such flight evinced, the trial judge's instruction regarding flight was not so prejudicial as to render the entire trial fundamentally unfair."  *Burton v.*

*Renico*, 391 F.3d 764, 778 (6th Cir. 2004).  Petitioner therefore has no right to habeas relief on the basis of his challenge to the jury instruction on flight.

**G.  Trial Counsel's Failure to Object** (claim seven)

Petitioner contends that his trial attorney deprived him of effective assistance by failing to object to the prosecutor's closing argument and to evidence that Petitioner had two .40 caliber weapons registered in his name.  Petitioner asserts that there was no strategic reason for not objecting to the prosecutor's argument or to evidence about the weapons.

The Michigan Court of Appeals concluded on review of this claim that an objection would have been unsuccessful because evidence about ownership of the guns was properly admitted and the prosecutor's remarks were permissible.  The Court of Appeals concluded that counsel was not ineffective for failing to make a futile objection.

To prevail on his claim here, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  Testimony about the .40 caliber weapons was relevant and admissible to show that Petitioner had the means to commit the shooting.   The prosecutor's remark – that Petitioner retrieved a second weapon from his car and then returned to the after-hours club to resume shooting – did not prejudice the defense because the other evidence against Petitioner was substantial and because the trial court instructed the jurors that the attorneys' comments were not evidence.

26

The Court therefore concludes that defense counsel's failure to object did not constitute deficient performance, and, even if it did, the deficient performance did not prejudice the defense.  Relief is not warranted on Petitioner's seventh claim.

## H.  The Sentence (claim eight)

Petitioner asserts that the trial court incorrectly scored offense variables five and seven of the Michigan sentencing guidelines.  Petitioner received fifty points for offense variable seven and fifteen points for offense variable five.  He claims that he should not have received any points for the two offense variables and that re-sentencing is required.  The Michigan Court of Appeals disagreed and concluded that, because the record supported the trial court's scoring of the offense variables, the trial court's determinations should not be disturbed.

The state trial court's alleged misinterpretation or misapplication of the State's sentencing guidelines "is a matter of state concern only," *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003), and "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Even if Petitioner's claim were cognizable on habeas review, the Court finds for the following reasons that the state court's adjudication of the claim was reasonable.

### 1.  Offense Variable Five

Petitioner challenges the score of fifteen points for offense variable five, which is "psychological injury to a member of a victim's family."  Mich. Comp. Laws § 777.35(1). This offense variable should be scored at fifteen points if "[s]erious psychological injury requiring professional treatment occurred to a victim's family."  Mich. Comp. Laws §

27

777.35(1)(a).   Zero points is appropriate only if "[n]o serious psychological injury requiring professional treatment occurred to a victim's family."   Mich. Comp. Laws § 777.35(1)(b).

The murder victim's nine-year-old daughter informed the trial court how much she loved and missed her father and continued to hurt from the loss.   The trial prosecutor then stated that, according to the girl's mother, the girl (or her mother) was being treating for grief counseling.  (Sentencing Tr., 15-16, Nov. 5, 2009.)

The murder victim's mother also addressed the trial court at sentencing.   She said, "[N]o one could be hurt more than I am," as Mark Williams was her only child, he was taken away from her too soon, and Petitioner had devastated her life.  (*Id.* at 17.)

The family members' comments indicate that "serious psychological injury requiring professional treatment occurred to a victim's family."   Mich. Comp. Laws § 777.35(1)(a).  The fact that they may not have sought treatment is not conclusive.  Mich. Comp. Laws § 777.35(2).   Consequently, the trial and appellate courts reasonably concluded that fifteen points was an accurate score for offense variable five.

**2.  Offense Variable Seven**

Petitioner received fifty points for Offense Variable Seven, which is appropriate if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense."  Mich. Comp. Laws Ann. § 777.37(1)(a).  The trial court stated at sentencing that Petitioner's conduct was not sadism or torture, but that firing ten shots at the assault victim was

excessive brutality warranting a score of fifty points.  (Sentencing Tr., 9-10, 19, Nov. 5, 2009.)

The Michigan Court of Appeals questioned whether firing ten times at Travon Williams in and of itself was excessively brutal conduct.  However, after examining the circumstances of the shooting, the Court of Appeals determined that Petitioner's conduct was excessively brutal and that the trial court's score of fifty points was not erroneous.  In describing Petitioner's conduct, the Court of Appeals wrote:

> Travon was initially shot while sitting down next to defendant.  After realizing he was shot, Travon immediately jumped up from his seat and started to run for the front door.  But, as he was running, defendant shot him twice in the back, causing Travon to fall face down to the ground. When Travon turned over, defendant had closed upon him and had the gun pointing at Travon's head.  Travon yelled, "You're not shooting me in the face," and, after the two briefly wrestled over the gun, defendant shot Travon many more times, for a total of ten times.

> For the instant case, the facts are clearly more than just shooting ten times. The evidence shows that defendant shot a fleeing victim in the back multiple times, moved up to the victim who was then lying on the ground, held the gun near the victim's face, and then shot the victim approximately seven more times.

*Armstrong*, No. 295293, 2011 WL 683108, at *9 and *10.

Petitioner's conduct, as accurately summarized by the Court of Appeals, could be described as "excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense."  Thus, the trial court reasonably concluded that fifty points was appropriate for offense variable seven.

To conclude, Petitioner's sentencing claim is not cognizable on habeas review, and even if it were, the record indicates that his sentence was not based on "extensively and materially false" information, which he had no opportunity to correct

29

through counsel. *Townsend v. Burke*, 334 U.S. 736, 741 (1948).   Consequently, Petitioner's right to due process was not violated, and re-sentencing is not required.

## I.  Newly Discovered Evidence

Petitioner appears to be raising an additional claim that the state trial court abused its discretion when it denied his post-conviction motion for an evidentiary hearing on newly discovered evidence.   The allegedly new evidence was a police report showing that, before the crimes occurred, Petitioner reported to the police that one of his two weapons was missing or stolen.   Petitioner appears to claim that prosecutor should have known about the missing weapon before introducing evidence that he possessed two .40 caliber weapons.   Petitioner further alleges that defense counsel was ineffective for failing to investigate and determine that the weapon was reported stolen before the murder and assault occurred.

Petitioner's contention that the trial court erred by construing his post-conviction motion as a motion for relief from judgment fails because "errors in post-conviction proceedings are outside the scope of federal habeas corpus review."   *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*,  794 F.2d 245, 246-47 (6th Cir. 1986), and *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)).   The reason that claims challenging state collateral post-conviction proceedings cannot be brought under the federal habeas corpus provision, is that " 'the traditional function of the writ is to secure release from illegal custody,' " and "[a] due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not 'result [in] . . .

release or a reduction in . . . time to be served or in any other way affect his detention . . . .' "  *Id.* (quoting *Kirby*, 794 F.2d at 246-47).

Furthermore, Petitioner's underlying claim about the prosecutor and defense counsel lack merit.  It is true that "suppression by the prosecution of evidence favorable to an accused upon request, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Nevertheless, Petitioner himself reported the missing weapon to the police on March 17, 2008, about a year and a half before his trial.  *See* Pet. for Writ of Habeas Corpus, Ex. B.  "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question . . . ." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

For similar reasons, defense counsel was not ineffective for failing to investigate or produce the police report about the missing weapon at trial.  Petitioner himself had access to that information and could have relayed the information to his attorney for use in cross-examining Officer Jimenez.

Furthermore, the evidence at trial established that Petitioner had two weapons registered in his name.  So, even if one weapon were missing before the crimes in question were committed, Petitioner could have committed the crimes with the other weapon that was registered to him.

Officer Jimenez, moreover, testified that he ran a LEIN (Law Enforcement Information Network) report on the weapons on the second day of trial and determined

that the two handguns were still registered under Petitioner's name.  He said that the LEIN report would indicate if the guns had been reported stolen, legitimately sold, or lost.  (Trial Tr. Vol. III, 17-18, Oct. 15, 2009.)  This testimony tends to refute Petitioner's contention that one of his guns was missing, lost, or stolen at the time of the shooting on March 30, 2008.

To conclude, there is no newly discovered evidence, and Petitioner has not demonstrated that the outcome of his trial would have been different if defense counsel had questioned Officer Jimenez about one of Petitioner's weapons being reported missing or stolen.  The Court concludes that habeas relief is not warranted on Petitioner's claim of newly discovered evidence and irregularities in the state post-conviction proceeding.

## IV.  Conclusion

The state courts' adjudication of Petitioner's claims on the merits did not result in decisions that were contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable determinations of the facts.  Nor were they so lacking in justification that there was an error beyond any possibility for fairminded disagreement.  As for the claims that the state court reviewed for "plain error" and did not adjudicate on the merits, the Court concludes from a *de novo* review of the claims that Petitioner's constitutional rights were not violated.  The Court therefore denies Petitioner's habeas corpus petition.

**V.  Denying a Certificate of Appealability, but**
**Granting Leave to Proceed *In Forma Pauperis* on Appeal**

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition.  Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller El,* 537 U.S. at 327.

For the reasons given above, reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong.  Nor would reasonable jurists conclude that the issues deserve encouragement to proceed further.  The Court therefore declines to issue a certificate of appealability on any of Petitioner's claims. Petitioner nevertheless may appeal this Court's decision *in forma pauperis*, because he was permitted to proceed *in forma pauperis* in this Court, and an appeal could be taken in good faith.  Fed. R. App. P. 24(a)(3)(A).


Dated: November 3, 2016                          s/ Nancy G. Edmunds
                                                 NANCY G. EDMUNDS
                                                 UNITED STATES DISTRICT JUDGE